[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11678
_____

D.C. Docket No. 9:12-cv-80746-DLB

BOARD OF TRUSTEES OF THE NATIONAL
ELEVATOR INDUSTRY HEALTH BENEFIT PLAN,

Plaintiff-Appellee,

versus

ROBERT MONTANILE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 25, 2014)

Before HULL, MARCUS and DUBINA, Circuit Judges.

HULL, Circuit Judge:

Defendant-appellant Robert Montanile appeals the district court's grant of

summary judgment in the amount of $121,044.02 in favor of the plaintiff-appellee

Board of Trustees of the National Elevator Industry Health Benefit Plan (the "Board") in its lawsuit against Montanile.  After an automobile accident, Montanile received a settlement from a third-party tortfeasor for injuries he suffered in the accident.  After that settlement, the plaintiff Board sued Montanile for reimbursement of the medical expenses already paid on defendant Montanile's behalf.  After review, we affirm.

## I. BACKGROUND

The facts of this case are largely undisputed.  The Board is the named fiduciary and administrator of the National Elevator Industry Health Benefit Plan (the "Plan").  The Plan is an employee welfare benefit plan as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.  At all relevant times, Robert Montanile was a covered employee under the Plan.

### A.    The Plan Documents

The parties filed three relevant documents relating to the Plan.  The first document, the Restated Agreement and Declaration of Trust (the "Trust Agreement"), establishes the Plan for the benefit of members of the International Union of Elevator Constructors (the "Union").[1]  The Trust Agreement also

---

[1]The record neither specifies Montanile's employer, nor expressly states that Montanile was a member of the Union.  Nonetheless, the parties agree that Montanile was covered by the Plan at all relevant times.

2

provides for the management of the Plan, governs Plan contributions, and creates general rules for claim management.

The Trust Agreement, however, does not provide the details regarding the health coverage and the benefits provided by the Plan and does not specify the procedures by which participants may seek benefits.  Rather, the Trust Agreement gives the Board "full discretionary authority to adopt a Plan of Welfare Benefits, which sets forth eligibility requirements, type, amount, and duration of benefits that are to be provided to eligible employees . . . ."  The Trust Agreement also provides that the "detailed basis on which payment of benefits is to be made pursuant to this Trust Agreement shall be set forth in the Plan of Welfare Benefits."  "Such Plan of Welfare Benefits shall be subject to amendment by the Trustees from time to time as they may, in their discretion, determine . . . ."  The Trust Agreement thus expressly contemplates that the participants' health coverage and benefits shall be set forth in a separate plan document from the Trust Agreement.

The second document, the National Elevator Bargaining Association Agreement with International Union of Elevator Constructors (the "Bargaining Agreement"), was effective from July 9, 2007, through July 8, 2012.  The Bargaining Agreement specified that there would be a "Health Benefit Plan" and that any changes to the Plan would be part of the bargaining agreement, as follows:

3

> The Health Benefit Plan covering life insurance, sickness
> and accident benefits, and hospitalization insurance, or
> any changes thereto that are in accordance with the
> National Elevator Industry Health Benefit Plan and
> Declaration of Trust, shall be a part of this Agreement
> and adopted by all parties signatory thereto.

The Bargaining Agreement also provided that "the decision(s) to increase or decrease the benefits provided by the Health Benefit Plan are matters committed to the discretion of the Trustees . . . ." The Bargaining Agreement did not specify any rights or obligations regarding the benefits that would be set forth in the Plan.

The third document, the 2005 version of the National Elevator Industry Health Benefit Plan Summary Plan Description (the "NEI Summary Plan Description"), was effective through, at least, May 2011. The 2005 version of the NEI Summary Plan Description was "written to reflect the changes in the Health Benefit Plan since the last version was printed." The document "provide[d] the required information about [Plan beneficiaries'] rights and protection under the law in order to comply with the Employee Retirement Income Security Act of 1974."

The NEI Summary Plan Description was 87 pages long and contained, inter alia, detailed information regarding eligibility for health benefits, the extent of specific types of benefits, and claim-filing procedures. The NEI Summary Plan Description also included provisions regarding the benefits provided by the Plan when the losses were caused by a third party and the Plan's rights to recovery and reimbursement. The NEI Summary Plan Description set forth the Plan's rights to

4

subrogation and first-recovery reimbursement out of any amounts recovered by the

Plan participants from another party as follows:

> **The Plan's Right of Recovery**
> The Plan has the right to recover benefits advanced by the Plan to a covered person for expenses or losses caused by another party.  . . .
>
> Amounts that have been recovered by a covered person from another party are assets of the Plan by virtue of the Plan's subrogation interest and are not distributable to any person or entity without the Plan's written release of its subrogation interest.  . . .
>
> The Plan's right of recovery also applies if benefits are advanced by the Plan to an individual on behalf of an injured covered person or to the covered person's assignee.
>
> **The Plan's Right of Reimbursement**
> The Plan has a right to first reimbursement out of any recovery.  Acceptance of benefits from the Plan for an injury or illness by a covered person, without any further action by the Plan and/or the covered person, constitutes an agreement that any amounts recovered from another party by award, judgment, settlement or otherwise, and regardless of how the proceeds are characterized, will promptly be applied first to reimburse the Plan in full for benefits advanced by the Plan due to the injury or illness and without reduction for attorneys' fees, costs, expenses or damages claimed by the covered person, and regardless of whether the covered person is made whole or recovers only part of his/her damages.

(Emphasis added).  While the NEI Summary Plan Description had this

reimbursement provision, the Trust Agreement and the Bargaining Agreement did

not have a similar provision.

## B.    Montanile's Injury and the Reimbursement Dispute

On December 1, 2008, Montanile was injured in a car accident involving a drunk driver. Montanile suffered injuries to his neck and lower back, requiring lumbar spinal fusion surgery and other medical treatment to reduce his pain and loss of function. The Plan paid Montanile's initial medical expenses of $121,044.02.

Montanile retained counsel and initiated a civil lawsuit against the driver of the other car for negligence. Montanile eventually obtained a $500,000 settlement from the other driver. Out of the settlement funds, Montanile paid his attorneys a $200,000 contingency fee and $63,788.48 to reimburse out-of-pocket expenses.

After defendant Montanile accepted the settlement, the plaintiff Board, as fiduciary for the Plan, asserted that the Plan had the right to be reimbursed out of the settlement proceeds for the medical expenses paid on Montanile's behalf. The Board and Montanile, through counsel, attempted to negotiate a resolution from June 2011 through January 2012. After settlement discussions reached an impasse, the Board filed a single-count ERISA lawsuit to enforce the Plan's reimbursement provision.

## C.    District Court Proceedings

In its complaint, the plaintiff Board alleged that "the National Elevator Industry Health Benefit Plan Summary Plan Description" met ERISA's

6

requirement of a written plan and summary plan description.  The Board claimed that, pursuant to the NEI Summary Plan Description, Montanile was required to fully reimburse the Plan from the settlement payment he received.

The plaintiff Board further alleged that "all or part of the settlement proceeds are within the actual or constructive possession of" Montanile and claimed that the Plan was "entitled to equitable restitution in the form of a constructive trust or equitable lien with respect to the disputed funds held in Defendant [Montanile's] actual or constructive possession."  The Board therefore requested that defendant Montanile "be ordered to turn over to the Plan any settlement funds in his actual or constructive possession (up to the amount of the benefits advanced by the Plan on his behalf) in order to enforce the written terms of the Plan of Welfare Benefits and ERISA."

In his answer, defendant Montanile admitted that the Plan "described in paragraph 11 of the Complaint" is one of the governing documents for the ERISA group health benefits Plan at issue in this case."  However, Montanile later reversed course and moved for summary judgment, arguing, inter alia, that the Bargaining Agreement and the Trust Agreement were the only "governing plan documents."  Montanile contended that any subrogation or reimbursement rights the Plan asserted must accordingly be found in one of those two documents.

The Board opposed Montanile's summary-judgment motion.  The Board contended that the NEI Summary Plan Description was a governing Plan document that could establish subrogation and reimbursement rights because the Bargaining Agreement and the Trust Agreement "reference a separate plan document that sets forth eligibility requirements, type, amount, and duration of benefits that are to be provided to covered persons."  According to the Board, the NEI Summary Plan Description was that document; no other document met the qualifications of a written plan of welfare benefits, and no other document defined a covered person's right to benefits under the Plan.  The Board also filed its own cross-motion for summary judgment.

Montanile opposed the Board's cross-motion for summary judgment, arguing that the reimbursement sought by the Board was not "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3)(B) because the funds on which the Board wished to assert an equitable lien had been dissipated through payments Montanile had made since receiving the settlement.

The district court found that the NEI Summary Plan Description was an enforceable, governing plan document required by ERISA.  Specifically, the district court stated that "[t]here can be no doubt that the NEI Summary Plan Description functioned as both the governing Plan document and the summary plan description mandated by ERISA."  The district court also then found that

8

reimbursement was appropriate equitable relief under § 1132(a)(3)(B) because "[t]he settlement proceeds represent an identifiable fund to which the Plan's lien attached and such proceeds belong 'in good conscience' to the Plan to the extent of the medical expenses it paid on Defendant's behalf." Accordingly, the district court denied Montanile's motion for summary judgment and granted summary judgment in favor of the Board in the amount of $121,044.02, which was what the Board had paid as Montanile's medical expenses.

Montanile timely appealed.

## II. RELEVANT ERISA PROVISIONS

ERISA authorizes plan participants and beneficiaries to bring civil actions "to recover benefits due" and "to enforce . . . rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The statute also authorizes participants, beneficiaries, and fiduciaries of a plan to seek "appropriate equitable relief . . . to enforce . . . the terms of the plan." Id. § 1132(a)(3)(B).

The statute does not specify where the "terms of the plan" must be found, but it does require every "employee benefit plan" to be "established and maintained pursuant to a written instrument." Id. § 1102(a)(1). The written instrument "shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." Id.

9

In the same section as the "written instrument" provision, ERISA requires that each plan must

> (1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan . . . ,
> (2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan . . . ,
> (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan, and
> (4) specify the basis on which payments are made to and from the plan.

Id. § 1102(b).  The text of the statute, however, does not state that the four requirements of each plan must be in the same "written instrument" that establishes and maintains the Plan.

Nonetheless, ERISA mandates that a "summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries" of the plan.  Id. § 1022(a).  "The summary plan description . . . shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  Id.

### III. DISCUSSION

On appeal, Montanile argues that the district court erred in finding that the Board could impose an equitable lien on the settlement funds because the funds

10

had been spent or dissipated.  As both parties recognize in their supplemental briefs, Montanile's argument is now foreclosed by our recent holding in AirTran Airways, Inc. v. Elem, 767 F.3d 1192 (11th Cir. 2014).  This Court held in AirTran that, pursuant to § 1132(a)(3)(B), an equitable lien immediately attached to settlement funds where a plan provision's unambiguous terms gave the plan a first-priority claim to all payments made by a third party.  Id. at 1198.  The AirTran court held that the settlement funds were "specifically identifiable," and a plan participant's dissipation of the funds thus "could not destroy the lien that attached before" the dissipation.  Id. (emphasis in original).  This holding binds our decision here.  Accordingly, the Board can impose an equitable lien on Montanile's settlement, even if dissipated, if his health benefit Plan gave the Plan a first-priority claim to the settlement payments Montanile received.

Here, the NEI Summary Plan Description gave the Plan a first-priority claim to settlement proceeds Montanile received from a third party.  Therefore, as an alternative argument, Montanile contends that the NEI Summary Plan Description is not a governing Plan document and thus its terms are not enforceable as part of the Plan.  Because the district court concluded that the NEI Summary Plan Description was an enforceable, governing Plan document at the summary-judgment stage, we must review de novo, rather than for clear error.  See Wooden v. Bd. of Regents of Univ. Sys. of Georgia, 247 F.3d 1262, 1271 n.9 (11th Cir.

11

2001) ("[A] district court does not make factual findings in deciding a summary judgment motion, so no question of clear error review . . . arises here.").

## A.    Dual Function of a Summary Plan Description

First, Montanile argues that a single document, such as the NEI Summary Plan Description, cannot be both (1) a written instrument that sets forth the Plan's terms, as required by § 1102(a)(1), and (2) a summary plan description, as required by § 1022.[2]

We have previously indicated that a single document can serve both functions.  See Alday v. Container Corp. of Am., 906 F.2d 660, 666 (11th Cir. 1990) (stating that a summary plan description "clearly functioned as the plan document required by ERISA" and "unambiguously set out the rights of the parties").  Indeed, in his response to the Board's cross-motion for summary judgment in the district court, "Montanile acknowledge[d] that ERISA plan fiduciaries may draft a document that operates both as the governing plan document and the SPD mandated by ERISA . . . ."[3]  However, Montanile on appeal now contends that the Supreme Court's decision in CIGNA Corp. v. Amara, 563 U.S. ___, 131 S. Ct. 1866, 1870 (2011), requires us to hold otherwise.

---

[2]Although the plaintiff Board claims that defendant Montanile waived this argument, we need not resolve that issue as it lacks merit in any event.

[3]In the district court, Montanile conceded that a summary plan description could serve as a governing document, but contended that the NEI Summary Plan Description did not so serve. We address this argument infra, Part III.B.

In Amara, the original provisions contained in CIGNA's governing pension plan document provided that employees would receive a pension plan in the form of a defined-benefit annuity. Id. at ___, 131 S. Ct. at 1871. In November 1997, CIGNA announced in a newsletter that it was converting the pension plan into a plan with "cash balance" individual retirement accounts. Id. at ___, 131 S. Ct. at 1871-72. In 1998, CIGNA effected the change to cash-balance accounts in new governing plan documents. Id. However, the district court found that CIGNA intentionally misled its employees in the November 1997 written communication regarding the changes. Id. at ___, 131 S. Ct. at 1872. The district court then reformed the plan's provisions to be consistent with the November 1997 written communication regarding the change. Id. at ___, 131 S. Ct. at 1875-76. Importantly, the district court's reformation did not merely reinstate the defined-benefit plan. Instead, the district court created a plan that included terms that were not found in either the original plan or the new plan. See id. at ___, 131 S. Ct. at 1876-77.

After granting certiorari, the Supreme Court held that the district court lacked the power, pursuant to § 1132(a)(1), to change the terms of the plan where the change imposed by the court "seems less like the simple enforcement of a contract as written and more like an equitable remedy." Id. at ___, 131 S. Ct. at 1876-77. The Supreme Court rejected the proposition that the 1997 written

communication, even if construed as a statutorily-required plan summary, "necessarily may be enforced . . . as the terms of the plan itself." [4] Id. at ___, 131 S. Ct. at 1877 (emphasis added).  The Supreme Court stated that the syntax of § 1022(a), "requiring that participants and beneficiaries be advised of their rights and obligations 'under the plan,' suggests that the information about the plan provided [in a summary plan description] is not itself part of the plan."  Id. (emphasis in original).

Additionally, the Supreme Court stated that it had "no reason to believe that the statute intends to mix the responsibilities [of plan sponsor and plan administrator] by giving the administrator the power to set plan terms indirectly by including them in the summary plan descriptions."  Id.  Finally, the Supreme Court noted that "[t]o make the language of a plan summary legally binding could well lead plan administrators to sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers."  Id. at ___, 131 S. Ct. at 1877-78.

Although "dicta from the Supreme Court is not something to be lightly cast aside," Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997), the facts of this case are materially distinguishable from the facts of Amara.  To

---

[4]Although the misleading communication at issue in Amara was a summary of a material plan change, both summaries of material changes made to ERISA plans and the standard summary plan descriptions are governed by 29 U.S.C. § 1022(a).  Accordingly, the Supreme Court indicated that its analysis applied with equal force to summary plan descriptions.  See Amara, 563 U.S. at ___, 131 S. Ct. at 1877 ("[W]e cannot agree that the terms of statutorily required plan summaries (or summaries of plan modifications) necessarily may be enforced (under § 502(a)(1)(B)) as the terms of the plan itself.").

14

begin with, the Supreme Court's holding in <u>Amara</u>—that the district court lacked the power under § 1132(a)(1) to enforce an equitable remedy—does not impact our analysis.  The provision under which the Board seeks relief here, § 1132(a)(3), specifically grants the Board the right to seek equitable relief.  29 U.S.C. § 1132(a)(3)(B).

Furthermore, <u>Amara</u> only precludes courts from enforcing summary plan descriptions, pursuant to § 1132(a)(1), where the terms of that summary <u>conflict</u> with the terms specified in other, governing plan documents.  However, the <u>Amara</u> Court had no occasion to consider whether the terms of a summary plan description are enforceable where it is the <u>only</u> document that "specif[ies] the basis on which payments are made to and from the plan," as required by § 1102(b).  <u>Cf.</u> <u>Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey</u>, 663 F.3d 1124, 1131 (10th Cir. 2011) (holding that <u>Amara</u> did not prevent a court from giving deferential review to a Plan's decision regarding a term found only in a summary plan description because "the SPD does not conflict with the Plan or present terms unsupported by the Plan; rather, it <u>is</u> the Plan" (emphasis in original)).  Indeed, the <u>Amara</u> Court's rejection of the proposition that summary plan descriptions "<u>necessarily</u> may be enforced . . . as the terms of the plan itself" leaves open the possibility that terms in those summaries may, at times, be enforced, even though

15

they are not always enforceable.  See Amara, 563 U.S. at ___, 131 S. Ct. at 1877

(emphasis added).

Here, the NEI Summary Plan Document does not conflict with any pre-

existing plan documents that set out the rights of the parties—because no other

written instrument specifies the benefits and obligations of Plan participants.  The

terms specified in that summary plan description are enforceable, pursuant to

§ 1132(a)(3) because (1) no other document lays out the rights and obligations of

plan participants and (2) the Trust Agreement contemplated the rights and

obligations would be set forth in a separate document.

## B.    The Governing Plan Documents

In the alternative, Montanile argues that, even if a summary plan description

theoretically could serve both roles, the district court erred by finding that terms

found only in the NEI Summary Plan Description were enforceable because the

Trust Agreement constituted the sole governing Plan document.[5]

Enforceable plan terms may be found in more than one document.  See

Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83, 115 S. Ct. 1223, 1230

(1995) ("In the words of the key congressional report, '[a] written plan is to be

required in order that every employee may, on examining the plan documents,

determine exactly what his rights and obligations are under the plan.'" (quoting

---

[5]Montanile no longer contends that the Bargaining Agreement is a governing Plan document.

16

H.R. Conf. Rep. No. 93-1280, at 297, as reprinted in 1974 U.S.C.C.A.N. 5038, 5077-78) (emphasis added)).  Montanile does not dispute this point.

Here, the terms of the Trust Agreement demonstrate that the enforceable terms of the Plan are to be found in more than just that one document.  In particular, the Trust Agreement does not "specify the basis on which payments are made to and from the plan," as required by § 1102(b).  Rather, it states that the Trustees will establish the "detailed basis on which payment of benefits is to be made" in "the Plan of Welfare Benefits."  Although the NEI Summary Plan Description does not carry the title contemplated by the Trust Agreement, it serves the precise function as that proposed for the "Plan of Welfare Benefits."  Indeed, Montanile initially admitted that the NEI Summary Plan Description was "one of the governing documents for the ERISA group health benefits Plan at issue in this case" before reversing course in his motion for summary judgment.

Furthermore, if the enforceable terms of the Plan were limited to those found in the Trust Agreement, there would be no governing document that specifies Plan participants' rights or obligations regarding benefits.  Plan participants would thus be barred from enforcing their rights under the straight-forward provisions of § 1132(a)(1).  And, if we held that the Board could not use the equitable provision of § 1132(a)(3) to enforce the Plan's right to reimbursement, it would not be clear that Plan participants could enforce in equity any participant rights found solely in

17

the NEI Summary Plan Description.  We refuse to embrace such an outcome.  See Admin. Comm. of Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v. Gamboa, 479 F.3d 538, 544 (8th Cir. 2007) ("ERISA requires a written arrangement, and no other document exists by which group health benefits are provided. . . . It would be nonsensical to conclude that the plain language of the Plan requires an interpretation that renders no plan at all under the terms of ERISA.").

We hold that the NEI Summary Plan Description constitutes a written instrument that sets out enforceable "terms of the plan."  See Alday, 906 F.2d at 666.  Accordingly, pursuant to § 1132(a)(3), the Board could enforce the term found in the NEI Summary Plan Description that gave it a subrogation interest in sums recovered from third parties.

## IV. CONCLUSION

For all of the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the Board and denial of Montanile's summary-judgment motion.

**AFFIRMED.**

18