(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONTANILE *v.* BOARD OF TRUSTEES OF THE NATIONAL ELEVATOR INDUSTRY HEALTH BENEFIT PLAN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 14–723. Argued November 9, 2015—Decided January 20, 2016

Employee benefits plans regulated by the Employee Retirement Income Security Act of 1974 (ERISA or Act) often contain subrogation clauses requiring a plan participant to reimburse the plan for medical expenses if the participant later recovers money from a third party for his injuries. Here, petitioner Montanile was seriously injured by a drunk driver, and his ERISA plan paid more than $120,000 for his medical expenses. Montanile later sued the drunk driver, obtaining a $500,000 settlement. Pursuant to the plan's subrogation clause, respondent plan administrator (the Board of Trustees of the National Elevator Industry Health Benefit Plan, or Board), sought reimbursement from the settlement. Montanile's attorney refused that request and subsequently informed the Board that the fund would be transferred from a client trust account to Montanile unless the Board objected. The Board did not respond, and Montanile received the settlement.

Six months later, the Board sued Montanile in Federal District Court under §502(a)(3) of ERISA, which authorizes plan fiduciaries to file suit "to obtain . . . appropriate equitable relief . . . to enforce . . . the terms of the plan." 29 U. S. C. §1132(a)(3). The Board sought an equitable lien on any settlement funds or property in Montanile's possession and an order enjoining Montanile from dissipating any such funds. Montanile argued that because he had already spent almost all of the settlement, no identifiable fund existed against which to enforce the lien. The District Court rejected Montanile's argument, and the Eleventh Circuit affirmed, holding that even if Montanile had completely dissipated the fund, the plan was entitled to re-

imbursement from Montanile's general assets.

*Held*: When an ERISA-plan participant wholly dissipates a third-party settlement on nontraceable items, the plan fiduciary may not bring suit under §502(a)(3) to attach the participant's separate assets. Pp. 5–15.

(a) Plan fiduciaries are limited by §502(a)(3) to filing suits "to obtain . . . equitable relief." Whether the relief requested "is legal or equitable depends on [1] the basis for [the plaintiff's] claim and [2] the nature of the underlying remedies sought." *Sereboff* v. *Mid Atlantic Medical Services, Inc.,* 547 U. S. 356, 363. Pp. 5–9.

(1) This Court's precedents establish that the basis for the Board's claim—the enforcement of a lien created by an agreement to convey a particular fund to another party—is equitable. See *Sereboff,* 547 U. S., at 363–364. The Court's precedents also establish that the nature of the Board's underlying remedy—enforcement of a lien against "specifically identifiable funds that were within [Montanile's] possession and control," *id.,* at 362–363—would also have been equitable had the Board immediately sued to enforce the lien against the fund. But those propositions do not resolve the question here: whether a plan is still seeking an equitable remedy when the defendant has dissipated all of a separate settlement fund, and the plan then seeks to recover out of the defendant's general assets. Pp. 5–7.

(2) This Court holds today that a plan is not seeking equitable relief under those circumstances. In premerger equity courts, a plaintiff could ordinarily enforce an equitable lien, including, as here, an equitable lien by agreement, only against specifically identified funds that remained in the defendant's possession or against traceable items that the defendant purchased with the funds. See 4 S. Symons, Pomeroy's Equity Jurisprudence §1234, pp. 692–695. If a defendant dissipated the entire fund on nontraceable items, the lien was eliminated and the plaintiff could not attach the defendant's general assets instead. See Restatement of Restitution, §215(1), p. 866. Pp. 8–9.

(b) The Board's arguments in favor of the enforcement of an equitable lien against Montanile's general assets are unsuccessful. *Sereboff* does not contain an exception to the general asset-tracing requirement for equitable liens by agreement. See 547 U. S., at 365. Nor does historical equity practice support the enforcement of an equitable lien against general assets. And the Board's claim that ERISA's objectives are best served by allowing plans to enforce such liens is a "vague notio[n] of [the] statute's 'basic purpose' . . . inadequate to overcome the words of its text regarding the specific issue under consideration." *Mertens* v. *Hewitt Associates,* 508 U. S. 248, 261. Pp. 9–14.

Syllabus

(c) The case is remanded for the District Court to determine, in the first instance, whether Montanile kept his settlement fund separate from his general assets and whether he dissipated the entire fund on nontraceable assets. P. 14.

593 Fed. Appx. 903, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined, and in which ALITO, J., joined except for Part III–C. GINSBURG, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–723

_____

## ROBERT MONTANILE, PETITIONER *v.* BOARD OF TRUSTEES OF THE NATIONAL ELEVATOR INDUSTRY HEALTH BENEFIT PLAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[January 20, 2016]

JUSTICE THOMAS delivered the opinion of the Court.*

When a third party injures a participant in an employee benefits plan under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.*, the plan frequently pays covered medical expenses.  The terms of these plans often include a subrogation clause requiring a participant to reimburse the plan if the participant later recovers money from the third party for his injuries.  And under ERISA §502(a)(3), 29 U. S. C. §1132(a)(3), plan fiduciaries can file civil suits "to obtain . . . appropriate equitable relief . . . to enforce . . . the terms of the plan."[1]

In this case, we consider what happens when a participant obtains a settlement fund from a third party, but

_____

\*JUSTICE ALITO joins this opinion, except for Part III–C.

[1] In full, the provision states: "A civil action may be brought— . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U. S. C. §1132(a)(3).

spends the whole settlement on nontraceable items (for instance, on services or consumable items like food). We evaluate in particular whether a plan fiduciary can sue under §502(a)(3) to recover from the participant's remaining assets the medical expenses it paid on the participant's behalf. We hold that, when a participant dissipates the whole settlement on nontraceable items, the fiduciary cannot bring a suit to attach the participant's general assets under §502(a)(3) because the suit is not one for "appropriate equitable relief." In this case, it is unclear whether the participant dissipated all of his settlement in this manner, so we remand for further proceedings.

I

Petitioner Robert Montanile was a participant in a health benefits plan governed by ERISA and administered by respondent, the Board of Trustees of the National Elevator Industry Health Benefit Plan (Board of Trustees or Board). The plan must pay for certain medical expenses that beneficiaries or participants incur. The plan may demand reimbursement, however, when a participant recovers money from a third party for medical expenses. The plan states: "Amounts that have been recovered by a [participant] from another party are assets of the Plan . . . and are not distributable to any person or entity without the Plan's written release of its subrogation interest." App. 45. The plan also provides that "any amounts" that a participant "recover[s] from another party by award, judgment, settlement or otherwise . . . will promptly be applied first to reimburse the Plan in full for benefits advanced by the Plan . . . and without reduction for attorneys' fees, costs, expenses or damages claimed by the covered person." *Id.*, at 46. Participants must notify the plan and obtain its consent before settling claims.

In December 2008, a drunk driver ran through a stop sign and crashed into Montanile's vehicle. The accident

severely injured Montanile, and the plan paid at least $121,044.02 for his initial medical care. Montanile signed a reimbursement agreement reaffirming his obligation to reimburse the plan from any recovery he obtained "as a result of any legal action or settlement or otherwise." *Id.*, at 51 (emphasis deleted).

Thereafter, Montanile filed a negligence claim against the drunk driver and made a claim for uninsured motorist benefits under Montanile's car insurance. He obtained a $500,000 settlement. Montanile then paid his attorneys $200,000 and repaid about $60,000 that they had advanced him. Thus, about $240,000 remained of the settlement. Montanile's attorneys held most of that sum in a client trust account. This included enough money to satisfy Montanile's obligations to the plan.

The Board of Trustees sought reimbursement from Montanile on behalf of the plan, and Montanile's attorney argued that the plan was not entitled to any recovery. The parties attempted but failed to reach an agreement about reimbursement. After discussions broke down, Montanile's attorney informed the Board that he would distribute the remaining settlement funds to Montanile unless the Board objected within 14 days. The Board did not respond within that time, so Montanile's attorney gave Montanile the remainder of the funds.

Six months after negotiations ended, the Board sued Montanile in District Court under ERISA §502(a)(3), 29 U. S. C. §1132(a)(3), seeking repayment of the $121,044.02 the plan had expended on his medical care. The Board asked the court to enforce an equitable lien upon any settlement funds or any property which are "'in [Montanile's] actual or constructive possession.'" 593 Fed. Appx. 903, 906 (CA11 2014) (quoting complaint). Because Montanile had already taken possession of the settlement funds, the Board also sought an order enjoining Montanile from dissipating any such funds. Montanile then stipulated

that he still possessed some of the settlement proceeds.

The District Court granted summary judgment to the Board. No. 12–80746–Civ. (SD Fla., Apr. 18, 2014), 2014 WL 8514011, *1. The court rejected Montanile's argument that, because he had by that time spent almost all of the settlement funds, there was no specific, identifiable fund separate from his general assets against which the Board's equitable lien could be enforced. *Id.,* at *8–*11. The court held that, even if Montanile had dissipated some or all of the settlement funds, the Board was entitled to reimbursement from Montanile's general assets. *Id.,* at *10–*11. The court entered judgment for the Board in the amount of $121,044.02.

The Court of Appeals for the Eleventh Circuit affirmed. It reasoned that a plan can always enforce an equitable lien once the lien attaches, and that dissipation of the specific fund to which the lien attached cannot destroy the underlying reimbursement obligation. The court therefore held that the plan can recover out of a participant's general assets when the participant dissipates the specifically identified fund. 593 Fed. Appx., at 908.

We granted certiorari to resolve a conflict among the Courts of Appeals over whether an ERISA fiduciary can enforce an equitable lien against a defendant's general assets under these circumstances.[2] 575 U. S. ___ (2015). We hold that it cannot, and accordingly reverse the judgment of the Eleventh Circuit and remand for further proceedings.

———————
[2] Compare *Thurber* v. *Aetna Life Ins. Co.*, 712 F. 3d 654 (CA2 2013), *Funk* v. *CIGNA Group Ins.*, 648 F. 3d 182 (CA3 2011), *Cusson* v. *Liberty Life Assurance Co. of Boston*, 592 F. 3d 215 (CA1 2010), *Longaberger Co.* v. *Kolt*, 586 F. 3d 459 (CA6 2009), and *Gutta* v. *Standard Select Trust Ins. Plans*, 530 F. 3d 614 (CA7 2008), with *Treasurer, Trustees of Drury Industries, Inc. Health Care Plan & Trust* v. *Goding*, 692 F. 3d 888 (CA8 2012), and *Bilyeu* v. *Morgan Stanley Long Term Disability Plan*, 683 F. 3d 1083 (CA9 2012).

## II

### A

As previously stated, §502(a)(3) of ERISA authorizes plan fiduciaries like the Board of Trustees to bring civil suits "to obtain other appropriate equitable relief . . . to enforce . . . the terms of the plan." 29 U. S. C. §1132(a)(3). Our cases explain that the term "equitable relief" in §502(a)(3) is limited to "those categories of relief that were *typically* available in equity" during the days of the divided bench (meaning, the period before 1938 when courts of law and equity were separate). *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256 (1993). Under this Court's precedents, whether the remedy a plaintiff seeks "is legal or equitable depends on [(1)] the basis for [the plaintiff's] claim and [(2)] the nature of the underlying remedies sought." *Sereboff* v. *Mid Atlantic Medical Services, Inc.*, 547 U. S. 356, 363 (2006) (internal quotation marks omitted). Our precedents also prescribe a framework for resolving this inquiry. To determine how to characterize the basis of a plaintiff's claim and the nature of the remedies sought, we turn to standard treatises on equity, which establish the "basic contours" of what equitable relief was typically available in premerger equity courts. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 217 (2002).

We have employed this approach in three earlier cases where, as here, the plan fiduciary sought reimbursement for medical expenses after the plan beneficiary or participant recovered money from a third party. Under these precedents, the basis for the Board's claim is equitable. But our cases do not resolve whether the *remedy* the Board now seeks—enforcement of an equitable lien by agreement against the defendant's general assets—is equitable in nature.

First, in *Great-West*, we held that a plan with a claim for an equitable lien was—in the circumstances presented—

6    MONTANILE *v.* BOARD OF TRUSTEES OF NAT. ELE-
VATOR INDUSTRY HEALTH BENEFIT PLAN
Opinion of the Court

seeking a legal rather than an equitable remedy. In that case, a plan sought to enforce an equitable lien by obtaining a money judgment from the defendants. The plan could not enforce the lien against the third-party settlement that the defendants had obtained because the defendants never actually possessed that fund; the fund went directly to the defendants' attorneys and to a restricted trust. We held that the plan sought a legal remedy, not an equitable one, even though the plan claimed that the money judgment was a form of restitution. *Id.*, at 208–209, 213–214. We explained that restitution in equity typically involved enforcement of "a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.,* at 213. But the restitution sought in *Great-West* was legal—not equitable—because the specific funds to which the fiduciaries "claim[ed] an entitlement . . . [we]re not in [the defendants'] possession." *Id.,* at 214. Since both the basis for the claim and the particular remedy sought were not equitable, the plan could not sue under §502(a)(3).

Next, in *Sereboff*, we held that both the basis for the claim and the remedy sought were equitable. The plan there sought reimbursement from beneficiaries who had retained their settlement fund in a separate account. 547 U. S., at 359–360. We held that the basis for the plan's claim was equitable because the plan sought to enforce an equitable lien by agreement, a type of equitable lien created by an agreement to convey a particular fund to another party. See *id.,* at 363–364. The lien existed in *Sereboff* because of the beneficiaries' agreement with the plan to convey the proceeds of any third-party settlement. We explained that a claim to enforce such a lien is equitable because the plan "could rely on a familiar rul[e] of equity" to collect—specifically, the rule "that a contract to convey

a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." *Ibid.* (internal quotation marks omitted; alteration in original). The underlying remedies that the plan sought also were equitable, because the plan "sought specifically identifiable funds that were within the possession and control" of the beneficiaries—not recovery from the beneficiaries' "assets generally." *Id.,* at 362–363 (internal quotation marks omitted).

Finally, in *US Airways, Inc.* v. *McCutchen*, 569 U. S. ___ (2013), we reaffirmed our analysis in *Sereboff* and again concluded that a plan sought to enforce an equitable claim by seeking equitable remedies. As in *Sereboff*, "the basis for [the plan's] claim was equitable" because the plan's terms created an equitable lien by agreement on a third-party settlement. See 569 U. S*.,* at ___ (slip op., at 5) (internal quotation marks omitted). And, as in *Sereboff*, "[t]he nature of the recovery requested" by the plan "was equitable because [it] claimed specifically identifiable funds within the [beneficiaries'] control—that is, a portion of the settlement they had gotten." 569 U. S., at ___ (slip op., at 5) (internal quotation marks omitted).

Under these principles, the basis for the Board's claim here is equitable: The Board had an equitable lien by agreement that attached to Montanile's settlement fund when he obtained title to that fund. And the nature of the Board's underlying *remedy* would have been equitable had it immediately sued to enforce the lien against the settlement fund then in Montanile's possession. That does not resolve this case, however. Our prior cases do not address whether a plan is still seeking an equitable remedy when the defendant, who once possessed the settlement fund, has dissipated it all, and the plan then seeks to recover out of the defendant's general assets.

B

To resolve this issue, we turn to standard equity trea-
tises. As we explain below, those treatises make clear that
a plaintiff could ordinarily enforce an equitable lien only
against specifically identified funds that remain in the
defendant's possession or against traceable items that the
defendant purchased with the funds (*e.g.,* identifiable
property like a car). A defendant's expenditure of the
entire identifiable fund on nontraceable items (like food or
travel) destroys an equitable lien. The plaintiff then may
have a personal claim against the defendant's general
assets—but recovering out of those assets is a *legal* remedy,
not an equitable one.

Equitable remedies "are, as a general rule, directed
against some specific thing; they give or enforce a right to
or over some particular thing . . . rather than a right to
recover a sum of money generally out of the defendant's
assets." 4 S. Symons, Pomeroy's Equity Jurisprudence
§1234, p. 694 (5th ed. 1941) (Pomeroy). Equitable liens
thus are ordinarily enforceable only against a specifically
identified fund because an equitable lien "is simply a right
of a special nature *over* the thing . . . so that the very thing
itself may be proceeded against in an equitable action."
*Id.*, §1233, at 692; see also Restatement of Restitution
§215, Comment *a*, p. 866 (1936) (Restatement) (enforce-
ment of equitable lien requires showing that the defendant
"still holds the property or property which is in whole or in
part its product"); 1 D. Dobbs, Law of Remedies §1.4, p. 19
(2d ed. 1993) (Dobbs) (similar). This general rule's appli-
cation to equitable liens includes equitable liens by
agreement, which depend on "the notion . . . that the
contract creates some right or interest in or over specific
property," and are enforceable only if "the decree of the
court can lay hold of" that specific property. 4 Pomeroy
§1234, at 694–695.

If, instead of preserving the specific fund subject to the

lien, the defendant dissipated the entire fund on nontraceable items, that complete dissipation eliminated the lien. Even though the defendant's conduct was wrongful, the plaintiff could not attach the defendant's general assets instead. Absent specific exceptions not relevant here, "where a person wrongfully dispose[d] of the property of another but the property cannot be traced into any product, the other . . . cannot enforce a constructive trust or lien *upon any part of the wrongdoer's property*." Restatement §215(1), at 866 (emphasis added); see also *Great-West*, 534 U. S., at 213–214 (citing Restatement §160). The plaintiff had "merely a personal claim against the wrongdoer"—a quintessential action at law. *Id.*, §215(1), at 866.

In sum, at equity, a plaintiff ordinarily could not enforce any type of equitable lien if the defendant once possessed a separate, identifiable fund to which the lien attached, but then dissipated it all. The plaintiff could not attach the defendant's general assets instead because those assets were not part of the specific thing to which the lien attached. This rule applied to equitable liens by agreement as well as other types of equitable liens.

## III

The Board of Trustees nonetheless maintains that it can enforce its equitable lien against Montanile's general assets. We consider the Board's arguments in turn.

## A

First, the Board argues that, while equity courts ordinarily required plaintiffs to trace a specific, identifiable fund in the defendant's possession to which the lien attached, there is an exception for equitable liens by agreement. The Board asserts that equitable liens by agreement require no such tracing, and can be enforced against a defendant's general assets. According to the Board, we

recognized this exception in *Sereboff* by distinguishing between equitable restitution (where a lien attaches because the defendant misappropriated property from the plaintiff) and equitable liens by agreement.

The Board misreads *Sereboff*, which left untouched the rule that *all* types of equitable liens must be enforced against a specifically identified fund in the defendant's possession.  See 1 Dobbs §4.3(3), at 601, 603.  The question we faced in *Sereboff* was whether plaintiffs seeking an equitable lien by agreement must "identify an asset they originally possessed, which was improperly acquired and converted into property the defendant held."  547 U. S., at 365.  We observed that such a requirement, although characteristic of restitutionary relief, does not  "appl[y] to equitable liens by agreement or assignment."  *Ibid.* (discussing *Barnes* v. *Alexander*, 232 U. S. 117 (1914)).  That is because the basic premise of an equitable lien by agreement is that, rather than physically taking the plaintiff's property, the defendant constructively possesses a fund to which the plaintiff is entitled.  But the plaintiff must still identify a specific fund in the defendant's possession to enforce the lien.  See *id.*, at 123 ("Having a lien upon the fund, as soon as it was identified they could follow it into the hands of the appellant").

B

Second, the Board contends that historical equity practice supports enforcement of its equitable lien against Montanile's general assets.  The Board identifies three methods that equity courts purportedly employed to effectuate this principle: substitute money decrees, deficiency judgments, and the swollen assets doctrine.  This argument also fails.

We have long rejected the argument that "equitable relief" under §502(a)(3) means "whatever relief a court of equity is empowered to provide in the particular case at

issue," including ancillary legal remedies. *Mertens,* 508 U. S*.,* at 256. In "many situations . . . an equity court could establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority." *Ibid.* (internal quotation marks omitted). But these legal remedies were not relief "typically available in equity," and interpreting them as such would eliminate any limit on the meaning of "equitable relief" and would "render the modifier superfluous." *Id.,* at 256, 258 (emphasis deleted); see also *Great-West*, *supra*, at 210. As we have explained—and as the Board conceded at oral argument—as a general rule, plaintiffs cannot enforce an equitable lien against a defendant's general assets. See Part II–B, *supra.* The Board contends that there is an exception if the defendant wrongfully dissipates the equitable lien to thwart its enforcement. But none of the Board's examples show that such relief was "typically available" in equity.[3]

The specific methods by which equity courts might have awarded relief from a defendant's general assets only confirm that the Board seeks legal, not equitable, remedies. While equity courts sometimes awarded money

_____

[3]The Board also interprets *CIGNA Corp.* v. *Amara*, 563 U. S. 421 (2011), as all but overruling *Mertens* v. *Hewitt Associates*, 508 U. S. 248 (1993), and *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204 (2002), in favor of the Board's broad interpretation of "equitable relief" under §502(a)(3). But *CIGNA* reaffirmed that "traditionally speaking, relief that sought a lien or a constructive trust was legal relief, not equitable relief, unless the funds in question were 'particular funds or property in the defendant's possession.'" 563 U. S, at 439 (quoting *Great-West*, *supra*, at 213; emphasis deleted). In any event, the Court's discussion of §502(a)(3) in *CIGNA* was not essential to resolving that case, and—as our later analysis in *US Airways, Inc.* v. *McCutchen*, 569 U. S. ___ (2013), reinforces—our interpretation of "equitable relief" in *Mertens*, *Great-West*, and *Sereboff* v. *Mid Atlantic Medical Services, Inc.*, 547 U. S. 356 (2006), remains unchanged. See *McCutchen*, *supra,* at ___–___ (slip op., at 5–6).

decrees as a substitute for the value of the equitable lien, they were still legal remedies, because they were "wholly pecuniary and personal." 4 Pomeroy §1234, at 694. The same is true with respect to deficiency judgments. Equity courts could award both of these remedies as part of their ancillary jurisdiction to award complete relief. But the treatises make clear that when equity courts did so, "the rights of the parties are strictly legal, and the final remedy granted is of the kind which might be conferred by a court of law." 1 *id.*, §231, at 410; see also 1 Dobbs §2.7, at 180–181, and §4.3(3), at 602 (similar); New Federal Equity Rules 10 (rev. 5th ed. 1925) (authorizing equity courts to award such relief). But legal remedies—even legal remedies that a court of equity could sometimes award—are not "equitable relief" under §502(a)(3). See *Mertens, supra,* at 256–258.

The swollen assets doctrine also does not establish that the relief the Board seeks is equitable. Under the Board's view of this doctrine, even if a defendant spends all of a specifically identified fund, the mere fact that the defendant wrongfully had assets that belonged to another increased the defendant's available assets, and justifies recovery from his general assets. But most equity courts and treatises rejected that theory. See Taft, Note, A Defense of a Limited Use of the Swollen Assets Theory Where Money Has Wrongfully Been Mingled With Other Money, 39 Colum. L. Rev. 172, 175 (1939) (describing the swollen assets doctrine as "often . . . rejected by the courts"); see also Oesterle, Deficiencies of the Restitutionary Right to Trace Misappropriated Property in Equity and in UCC §9–306, 68 Cornell L. Rev. 172, 189, and n. 33 (1983) (similar). To the extent that courts endorsed any version of the swollen assets theory, they adopted a more limited rule: that commingling a specifically identified fund—to which a lien attached—with a different fund of the defendant's did not destroy the lien. Instead, that

commingling allowed the plaintiff to recover the amount of the lien from the entire pot of money. See Restatement §209, at 844; Scott, The Right To Follow Money Wrongfully Mingled With Other Money, 27 Harv. L. Rev. 125, 125–126 (1913). Thus, even under the version of the swollen assets doctrine adopted by some courts, recovery out of Montanile's general assets—in the absence of commingling—would not have been "typically available" relief.

C

Finally, the Board argues that ERISA's objectives—of enforcing plan documents according to their terms and of protecting plan assets—would be best served by allowing plans to enforce equitable liens against a participant's general assets. The Board also contends that, unless plans can enforce reimbursement provisions against a defendant's general assets, plans will lack effective or cost-efficient remedies, and participants will dissipate any settlement as quickly as possible, before fiduciaries can sue.

We have rejected these arguments before, and do so again. "[V]ague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Mertens, supra,* at 261. Had Congress sought to prioritize the Board's policy arguments, it could have drafted §502(a)(3) to mirror ERISA provisions governing civil actions. One of those provisions, for instance, allows participants and beneficiaries to bring civil actions "to enforce [their] rights under the terms of the plan" and does not limit them to equitable relief. *Great-West,* 534 U. S., at 221 (quoting 29 U. S. C. §1132(a)(1)(B) (1994 ed.)).

In any event, our interpretation of §502(a)(3) promotes ERISA's purposes by "allocat[ing] liability for plan-related misdeeds in reasonable proportion to respective actors' power to control and prevent the misdeeds." *Mertens,*

*supra,* at 262.  More than a decade has passed since we decided *Great-West*, and plans have developed safeguards against participants' and beneficiaries' efforts to evade reimbursement obligations.  Plans that cover medical expenses know how much medical care that participants and beneficiaries require, and have the incentive to investigate and track expensive claims.  Plan provisions—like the ones here—obligate participants and beneficiaries to notify the plan of legal process against third parties and to give the plan a right of subrogation.

The Board protests that tracking and participating in legal proceedings is hard and costly, and that settlements are often shrouded in secrecy.  The facts of this case undercut that argument.  The Board had sufficient notice of Montanile's settlement to have taken various steps to preserve those funds.  Most notably, when negotiations broke down and Montanile's lawyer expressed his intent to disburse the remaining settlement funds to Montanile unless the plan objected within 14 days, the Board could have—but did not—object.  Moreover, the Board could have filed suit immediately, rather than waiting half a year.

IV

Because the lower courts erroneously held that the plan could recover out of Montanile's general assets, they did not determine whether Montanile kept his settlement fund separate from his general assets or dissipated the entire fund on nontraceable assets.  At oral argument, Montanile's counsel acknowledged "a genuine issue of . . . material fact on how much dissipation there was" and a lack of record evidence as to whether Montanile mixed the settlement fund with his general assets.  A remand is necessary so that the District Court can make that determination.

Opinion of the Court

\*      \*      \*

We reverse the judgment of the Eleventh Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

### No. 14–723

_____

## ROBERT MONTANILE, PETITIONER *v.* BOARD OF TRUSTEES OF THE NATIONAL ELEVATOR INDUSTRY HEALTH BENEFIT PLAN

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[Jaury 20, 2016]

JUSTICE GINSBURG, dissenting.

Montanile received a $500,000 settlement out of which he had pledged to reimburse his health benefit plan for expenditures on his behalf of at least $121,044.02. See *ante,* at 2–3. He can escape that reimbursement obligation, the Court decides, by spending the settlement funds rapidly on nontraceable items. See *ante,* at 8. What brings the Court to that bizarre conclusion? As developed in my dissenting opinion in *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 224–234 (2002), the Court erred profoundly in that case by reading the work product of a Congress sitting in 1974 as "unravel[ling] forty years of fusion of law and equity, solely by employing the benign sounding word 'equitable' when authorizing 'appropriate equitable relief.'" Langbein, What ERISA Means by "Equitable": The Supreme Court's Trail of Error in *Russell*, *Mertens*, and *Great-West*, 103 Colum. L. Rev. 1317, 1365 (2003). The Court has been persuasively counseled "to confess its error." *Ibid.* I would not perpetuate *Great-West*'s mistake, and would therefore affirm the judgment of the Court of Appeals for the Eleventh Circuit.